UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In Re: ) | |
| ) | |
| DAVID THOMAS HEATH, ) | Case No. 15-17803-HRT |
| SSN: xxx-xx-7785, ) | Chapter 7 |
| AVA MARIE HEATH, ) | |
| SSN: xxx-xx-3513 ) | |
| ) | |
| Debtors. ) | |

**ORDER DENYING MOTION TO DIMISS DEBTORS' CASE**

THIS MATTER is before the Court upon the Motion to Dismiss Debtors' Case pursuant to 11 U.S.C. § 707(b)(1) and 11 U.S.C. § 707(b)(3) filed by the United States Trustee ("UST") for Region 19, (Docket #18), and the response in opposition (Docket #25) filed by Ava Marie Heath ("Mrs. Heath") and David Thomas Heath, ("Mr. Heath")(collectively, the "Debtors"). The undersigned conducted the trial pursuant to Judge Howard Tallman's Order Regarding Evidentiary Hearing, (Docket #33).

### I.   BACKGROUND

Prior to moving to Colorado, the Debtors resided in the New York City metropolitan area. Mrs. Heath was a New York City police officer. Mr. Heath owned a company involved with the production of historically themed board games. In approximately January 2007, the Debtors purchased a 5 acre vacant lot just outside Pueblo West, Colorado. Thereafter, a one story ranch style new home was constructed on the land (the "Home"). The Home has 4,065 square feet on the first floor, a finished basement of the same size, and a three car attached garage consisting of 2,154 square feet. Construction of the Home was completed in approximately September 2008.

While the Home was considerably larger than their former New York residence, the costs associated with the new Home were similar on a monthly basis. Mr. Heath moved to Colorado when the Home was completed. Mrs. Heath remained in New York.

After moving to Colorado Mr. Heath sold his company, Matrix Games, for approximately $800,000 in 2011. Proceeds from the sale were used to pay debt and other employees. Proceeds were also used by the Debtors while Mr. Heath started a new business venture. Thereafter, in 2011, Mrs. Heath retired from the New York Police Force with the benefits of full pension and joined the family in Colorado. Mrs. Heath was a New York police officer at the time of "9/11."

1

Mr. Heath's new business has yet to become profitable. Mrs. Heath returned to work in 2013 and considerable debts were incurred to fund the business as it was being developed.

The Debtors filed a deficient Chapter 7 bankruptcy case on July 14, 2015, with only the petition, and a list of creditors. Thereafter, the Debtors filed the omitted Schedules and Statement of Financial Affairs, and Statement of Current Monthly Income.

The Debtors valued the Home at $699,500 on Schedule A – Real Property. On Schedule D – Creditors Holding Secured Claims, the Debtors listed secured claims against the home in the total amount of $711,811.00: A claim of $603,970.00 held by "Chase Mtg" secured by a first priority Deed of Trust; and a claim of $107,841.00 held by Vectra Bank Colorado secured by a second priority Deed of Trust.

In their Joint Pre-Trial Statement, the parties stipulated the Home has a fair market value of $699,000 subject to first mortgage with a balance in the approximate amount of $597,500 and a second mortgage in the approximate amount of $108,000 for a total of $705,500.00. No independent evidence was presented to establish the value of the Home, the balance of the secured obligations, the Pueblo real estate market or housing alternatives. Nevertheless, the fact that no significant equity exists in the Home is not in dispute.

The parties further stipulated that the monthly debt service associated with the Home, including taxes and insurance, is approximately $4,375. An additional $982 in other house-related expenses is incurred by the Debtors on a monthly basis. The Debtors seek to retain the Home while discharging their unsecured debts.

The UST argues the Debtor's should not be able to retain the Home at the expense of unsecured creditors. The UST calculates a significant dividend could be paid to unsecured creditors if the Debtors surrendered the Home and proceeded with a case under Chapter 13.

## II.   THE HOUSEHOLD SIZE

Before considering whether the case should be dismissed as abusive, the Court must address discrepancies in the reporting of the Debtors' household size. Much of the arguments and calculations presented by the UST are based on a household size of two. Indeed, in the Joint Pre-Trial Statement filed by the parties stipulated "[t]he Debtors are a married couple with no dependents with a family home located in Pueblo, Colorado."

In reality, the Debtors have three teenage sons, ages 12, 17 and 19 that reside in the Home. There was also testimony that one of the Debtors' mothers now resides in the Home. One son is 19 who is studying to be a phlebotomist. Mrs. Heath testified he has been a "difficult kid." Another son is 17 and a senior in high school. Mrs. Heath testified she and Mr. Heath

have "been on the line with him." Their third son is 12, in seventh grade, and helps his dad out with the home based business.

On July 28, 2015, the Debtors filed their Official Form 22 A – 1, Chapter 7 Statement of Monthly Income in which they disclosed the number of people in the household was five. (Exhibit 2). On the same day, the Debtors filed Schedule J: Your Expenses in which no dependents were identified. (Exhibit 1). Subsequent amendments to Schedule J filed on January 29, 2016 also reflected no dependents. (Exhibit 7). In response to a letter of inquiry from the UST concerning the inconsistent statements concerning the household size, Debtors' counsel responded: "I have no idea why I disclosed a household size of five on 22A. They don't have any children or other dependents." (Exhibit 11). This representation was erroneous. It appears the inconsistency in the disclosures was in part created by the deficient filing.

The parties represented the error in reporting the household size only came to light when preparing for the trial during the prior week, at which point the UST was advised of the error. Mrs. Heath testified that she was "fixated on the math" when preparing the bankruptcy paperwork and subsequent amendments, and overlooked the sections of the forms concerning dependents. The Court found this testimony to be credible.

The UST argues the Debtors should be judicially estopped from altering the previously represented household size of two. The doctrine of judicial estoppel serves to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-750 (2001). Citing *New Hampshire,* the Tenth Circuit set forth three factors to be considered in determining whether the application of the doctrine is warranted:

1. Whether the party's new position is clearly inconsistent with the former position;
2. Whether acceptance of the later position leads to the perception that the court is being misled; and
3. Whether asserting the inconsistent position would cause the party to gain an unfair advantage.

*Eastman v. Union Pac. R. Co. 493 F.3d 1151, 1156 (10th Cir. 2007).*

As applied in the context of bankruptcy, the doctrine of judicial estoppel usually arises in situations where an asset, often a legal claim, is concealed or not properly disclosed. Later, when the debtor seeks to pursue the claim, judicial estoppel can be employed to prevent recovery on the claim that, whether by omission or concealment, was represented not to exist in the prior bankruptcy proceeding.

The Supreme Court noted judicial estoppel may not be appropriate where the party's prior position was based on inadvertence or mistake. *New Hamshire*, *532 U.S. at 753*. Here, the Debtors' initial Form 22 filed with the Court disclosed a household size of five (5) while

3

Schedule J represented no dependents lived in the household. Debtors' counsel then mistakenly advised the UST of the incorrect household size. Mrs. Heath testified she really paid no attention to the form's questions relating to dependents. Instead, she was "fixated on the math."

This is not a situation where the Debtors stood to gain from the incorrect disclosure. The reporting of an erroneous smaller household size was to their direct detriment. While the Court is dismayed the issue was not discovered earlier, the Debtors gained no advantage from the error. It is also not a situation where the UST can claim unfair surprise. The Debtors' 2013 tax return, introduced as Exhibit 12 by the UST, reflects the same three dependents.

More importantly, in considering whether this case should be dismissed as an abuse of the Bankruptcy Code, the Court cannot ignore the reality of the actual household size. The Court cannot conceive of a situation where debtors would not advise counsel they have children. The only conclusion the Court can draw is counsel simply did not inquire. As egregious as this failure is, it would be unfair to remove three teenage sons from the equation in considering the totality of the Debtors' circumstances.

### III.  DISCUSSION

The UST's Motion to Dismiss is brought under 11 U.S.C. § 707(b)(1) and 11 U.S.C. § 707(b)(3). The Court has jurisdiction over this contested matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This contested matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1), (b)(2)(I), and (b)(2)(J).

11 U.S.C. § 707(b) applies to Chapter 7 bankruptcy cases filed by individuals whose debts are primarily consumer debts. In the present situation, the two secured obligations with respect to the Home total approximately $705,500.00. In addition, the Debtors own one motor vehicle valued at $27,000.00 secured by a claim in the approximate amount of $19,152.00. No argument has been presented that these debts are not consumer debts within the meaning of 11 U.S.C. § 101(8).

The remaining scheduled claims total approximately $358,060.00. The Debtors claim that significantly all, if not all of the other debt, including credit card debt, was incurred for business, rather than consumer purposes. Both Debtors testified that the additional debts arose from efforts to keep Mr. Heath's business afloat as it was being developed. The testimony was not refuted. Even so, given the amount of the debts associated with the Home alone, the Debtors' obligations consist primarily of consumer debts and the case is subject to the provisions 11 U.S.C. § 707(b).

The UST argues the Debtors should not be allowed to retain the Home. If the Debtors surrendered the Home, they would have disposable income to pay creditors. Much of the

argument is premised upon the erroneous conclusion the Debtors are alone in the Home and have no dependents.

Applying Internal Revenue Service Collection Standards ("IRS Standards") for a household of two people, the UST calculates the Debtors could pay roughly 90% of the unsecured debt over a five year period. The Court recognizes that the larger household size reduces the amount of disposable income and lessens the perception of abuse. This is not a case where two Debtors seek to retain a "luxury" home. It does not however, end the analysis.

Even with the recognition of the larger household size, the costs associated with the Home far exceed the IRS Standards housing allowance for a family of five in the region. While the IRS Standards serve as a guideline, no evidence was presented concerning the actual current comparable real estate market. With the exception Exhibit 13, a Pueblo County Assessor's report, very little evidence was presented concerning particulars of the Home. Primarily, testimony concerning the Home focused on its use to house a family of five and for business purposes.

Mrs. Heath is presently the primary income earner in the household. She has two sources of income. She receives a monthly pension from New York City Police Pension in the gross amount of $4,090.00. Exhibit 5, a Quarterly Statement for the period ending June 30, 2015, reflects a monthly net amount of $2,303.36. Mrs. Heath testified that medical insurance was no longer being deducted from the pension payment as it was too expensive.

Mrs. Heath also has full time employment with Colorado Department of Corrections. Exhibit 4 contains Mrs. Heath's pay advices. The most recent pay advice for the period ending February 29, 2016 reflects gross monthly income of $4,696.00 and net income of $2,899.93. Mrs. Heath testified she just received a promotion and beginning in May 2016 will receive gross income of $5,600.00 per month.

Mr. Heath is self employed. The Debtors' Statement of Financial Affairs listed four business entities: Lock n Load Publishing, LLC, a "Game Developer," that began operations in March 2013; ESC Studios, LLC, a "Software Developer" that began operations in September 2012; Intersect Licensing, LLC, a "Holding Company" that was formed in September 2015; and Jabez5 Holdings, LLC, a "Holding Company" that does not conduct business formed in August 2012.

The Lock n Load Publishing, LLC, business venture is involved in the production and marketing of games. The majority of the products are board games that allow players to recreate historical military battles. Mr. Heath has been engaged in the same line of business for approximately 20 years and has developed expertise in what he describes as a "niche" market.

Mr. Heath has been successful in the past. Approximately five or six years ago Mr. Heath was able to sell a former company known a Matrix Games for $800,000.00. His new business venture has not met with the same success.

The new business had an existing line of games, but as the games age, demand decreases. Mr. Heath was, and is, in the process of developing new games. Those games rely on counters to

track "forces" in the course of play. Counters were ordered and printed in China. The counters were flawed and could not be used. Suitable replacement counters have yet to be obtained.

Mr. Heath testified he works approximately 80 hours a week and is determined to make the new business venture successful. He also testified retention of the Home is critical to the continuation of the business.

Approximately 50% of the total square footage of the Home is dedicated to business usage and storage. Prior to filing for bankruptcy relief, Mr. Heath sought alternatives to the present situation. The products are largely comprised of pressed board and are required to be stored in a dry, cool area. The products are also prone to rodent infestation. As a result, self-service type storage facilities or backyard sheds are not options. Mr. Heath further testified that due to increased demand as a result of the proliferation of marijuana related businesses in the area, comparable warehouse space is cost prohibitive with rents ranging from $2,000 to $3,000 a month for suitable space. Mr. Heath testified that given the current market for warehouse space, retaining the Home and utilizing the space for business is more cost effective than downsizing the residence and obtaining a separate business premises. Mr. Heath testified surrender of the Home would cause the business venture to fail.

Mr. Heath's testimony was credible and not refuted. The UST did not offer any evidence related to the current markets for business or residential properties in the area beyond reference to the IRS Standards.

11 U.S.C. §707(b)(3) provides: In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in case in which the presumption in paragraph 2(a)(i) does not arise or is rebutted the court shall consider –

(A) whether the debtor filed the petition in bad faith; or
(B) the totality of the circumstances…of the debtor's financial situation demonstrates abuse.

As set forth in the UST's Motion to Dismiss, the Tenth Circuit adopted a totality of circumstances test. While not exclusive, several factors should be considered including: Whether the Debtors have stable income; whether the Debtors are eligible for relief under Chapter 13 of the bankruptcy Code; whether Debtors bankruptcy was preceded by a sudden calamity; whether the Debtors engaged in purchases beyond their ability to repay prior to the filing; whether the Debtors have excessive expenses; whether the Debtors schedules were accurate; whether the bankruptcy case was filed in good faith; and primarily, whether the Debtors have the ability to repay. *In re Stewart, 175 P.3d 796, 809-810 (10th Cir. 1999).*

*Stewart* was decided under the heightened standard of "substantial abuse" prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") which lowered the standard to simply "abuse" and removed the statutory presumption in favor of the debtor. *Stewart* it is still instructive in evaluating the totality of the circumstances.

The UST has not alleged the Debtors acted in bad faith, and the Court heard no testimony, or received any evidence to establish the Debtors lacked good faith. To the contrary,

the Court believes the Debtors have been acting in good faith and found their testimony to be credible.

No evidence was presented that the Debtors engaged in a pattern of making extravagant purchases beyond their ability to repay. The Debtors' testified they live a modest lifestyle, work diligently and have only taken one vacation in addition to their honeymoon over the course of the last thirty years. The Home was purchased and constructed approximately eight (8) years ago. No evidence was presented that the Debtors have not been able to make the required monthly payments. The Court concludes the Debtors have not engaged in a pattern of making excessive or extravagant pre-petition purchases.

A significant point of contention between the parties relates to whether the Debtors suffered a unique hardship or calamity that precipitated the bankruptcy filing. The Debtors argue the manufacturing defect in the production of the game counters was the unforeseen calamity that directly led to the bankruptcy filing. The UST argues that such production problems are commonplace in business and are not representative of unique hardship leading to bankruptcy such as sudden illness, disability or unemployment.

Mr. Heath testified that in twenty plus years of experience with the production of board games he never experienced a setback similar in nature. Mr. Heath testified the printing error is the primary cause the business venture has yet to become profitable. Again, this testimony was not refuted. The Court concludes the manufacturing defect setback was a principal precipitating factor for the bankruptcy filing.

Another factor to consider is whether the Debtors have a stable source of income. Mrs. Heath has been employed with the Colorado Department of Correction for approximately three years and has received two promotions. However, her continued employment is dependent upon passing certain physical requirements involving the apprehension and control of prisoners. Mrs. Heath is forty nine (49) years old. She testified the oldest employee is a male supervisor approximately ten years older. It is certainly possible Mrs. Heath will continue to meet the physical requirements of her position, it is also possible she may not. The Court concludes Mrs. Heath's current employment is stable.

Whether the Debtors are eligible for Chapter 13 relief is problematic. On the date the case was filed the Debtors qualified to be Debtors under Chapter 13. The Debtors listed secured debts totaling $947,152.98. The unsecured portion of the secured debts was listed in the amount of $228,400.72. Other general unsecured debts totaled $141,871.39 bringing the total scheduled unsecured debts to $370,272.11. At the time, 11 U.S.C. § 109(e) provided, in relevant part: Only an… individual with regular income and such individual's spouse… that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than $ 383,175 and noncontingent, liquidated, secured debts of less than $1,149,525 may be a debtor under chapter 13 of this title [11 USCS §§ 1301 et seq.].

In any event, the Debtors did not have sufficient income to fund a plan. The initial Schedules I and J reflect a monthly deficit of $2,680. Amended Schedules I & J reflected a monthly deficit of $1,314.

Mrs. Heath testified in light of her most recent promotion income is now sufficient to make ends meet. No evidence was presented that disposable income would be available to pay creditors absent surrender of the Home.

The Court finds with the glaring exception of the incorrect household size, the Debtors' schedules are generally accurate and reflect their true financial condition.

What is left to consider is whether the Debtors have an ability to pay creditors. The UST concedes this is not a situation where a presumption of abuse arises under 11 U.S.C. § 707(a)(2). Instead, the UST has alleges the Debtors have excessive expenses associated with the Home, and absent those expenses, would have the have the ability to make substantial payments to their unsecured creditors.

The UST argues that if the Home was surrendered, and substitute housing was obtained in line with the IRS Standards, disposable income would exist to pay creditors through a Chapter 13 Plan. The UST calculates unsecured creditors would receive a dividend of approximately 90% if the Home was surrendered.

Several problems exists with the argument. First, the calculation is based on the incorrect household size of two. The Court cannot determine what the approximate dividend might be in light of the larger household size. Second, the calculation was based on unsecured claims totaling $141,871. Mr. Heath testified surrender of the Home would necessarily result in the failure of the business venture. The Debtors listed a claim held by US Bank secured by "ESC Studios, LLC / Lock n Load Publishing, LLC / Intersect Licensing, LLC." The Debtors valued the collateral associated with the secured claim as $0.00. Upon the failure of the business venture, the resulting unsecured deficiency of $216,189 would increase the unsecured claims to $358,060, significantly diluting any distributions.

In contrast, the Debtors argue dismissal of the case serves no purpose and present the following scenario: If the case is dismissed and the Home is ultimately surrendered, then foreclosed upon by the holder of the first priority Deed of Trust, the resulting unsecured deficiency on account of the holder of second priority Deed of Trust of approximately $107,841 would prevent them from qualifying to be Debtors under Chapter 13 in a subsequent filing as they would exceed the debt limitations imposed under 11 U.S.C. § 109(e).

Moreover, they argue, the claim held by US Bank is not a consumer debt, and substantially all, if not all of their other unsecured debt was incurred for business, not consumer, purposes. The total amount of those claims, $358.060, exceeds the remaining consumer debt consisting of the unsecured deficiency on account of the second priority Deed of Trust and the car loan. Accordingly, dismissal would result in the loss of the Home and be followed by another bankruptcy filing not subject to the provisions of 11 U.S.C. § 707(b).

Courts are divided as to whether excessive housing costs constitute abuse. In this case, the Home houses a family of four (4) at a minimum. Also, there is no evidence of available alternatives in the same area. Many cases hold excessive mortgage payments can cause a budget to be excessive or unreasonable and justify dismissal for abuse. *In re Crink*, 402 B.R. 169, 171 (Bankr. M.D.N.C. 2009). *See also, In re Rooney* (436 B.R. 454, 458-459 (Bankr. N.D. Ohio 2010)(budgeted monthly housing expense excessive on interest only construction loan); *DeAngelis v. Ramsay (In re Ramsay)*, 440 B.R. 85, 96 (Bankr. M.D. Pa. 2010)("When a mortgage payment is too high, a more reasonable amount will be used to calculate whether a debtor has disposable income available that could be committed to funding a chapter 13 plan."); *In re Pandl* 407 B.R. 299, 303-304 (Bankr. S.D. Ohio 2009)(Dismissal appropriate where Debtors could pay substantial dividends to unsecured creditors in absence of mortgage payment exceeding IRS Standards for a house with no equity.)

Other courts have looked to the enactment of BAPCPA and the establishment of the "means test" set forth in 11 U.S.C. § 707(b)(2) and determined the secured payments associated with a debtor's residence are insulated from attack as the secured payments are not subject to a "reasonable and necessary" standard. *See, e.g. In re Johnson*, 399 B.R. 72, 79 (Bankr. S.D. Cal. 2008)("the Court concludes that Congress did not intend that consumers would be denied access to Chapter 7 solely because of the amount of the their mortgage payment on their principal residence."); *In re Dumas* 419 B.R. 704, 711 (Bankr. E.D. Tex. 2009)("the continued payment of the secured mortgage by the Debtors cannot constitute an improper allocation of financial resources when the Bankruptcy Code specifically endorses that allocation."); *In re Jensen*, 407 B.R. 378, 388 (Bankr. C.D. Cal. 2008)("the unintended but unavoidable consequence of this Congressional decision to favor secured credit is that some debtors will be able to retain luxury goods if they are willing to continue making secured debt payments, even if that means their unsecured creditors will not always be made whole.").

This Court is not satisfied with either approach and joins the growing number of courts that treat housing costs as one of the factors to be considered in evaluating the totality of the circumstances with respect to the debtor's financial situation. "In order to grant the Trustee's motion to dismiss under § 707(b)(3), the bankruptcy court must find that the Trustee has demonstrated by a preponderance of the evidence that the petition is an abuse of Chapter 7 under the totality of the circumstances." *Moutousis v. United States (In re Moutousis)*, 418 B.R. 703, 710 ( E.D. Mich. 2009). The *Moutousis* Court reversed and remanded the bankruptcy court's dismissal of the case based solely on housing expenses in excess of IRS Standards. *Id.*

In the case of *In re Jaramillo*, the Court rejected a mechanical analysis for determining whether mortgage payments are too high, adopting a case by analysis of the individual debtor's circumstances. *In re Jaramillo,* 404 B.R. 404, 412 (Bankr. N.M. 2015). Finding, under the circumstances of the case, allowing high housing expenses combined with excessive life insurance premiums totaling approximately a month $12,822 would be an abuse, the case was dismissed under 11 U.S.C. § 707(b)(3). *Id.* at 413.

*In re Lorenca* involved a situation where the debtors sought to retain both their primary residence and certain investment property. The *Lorenca* Court noted the Congressional policy

9

preference of protecting a debtor's home. The Court allowed the debtors to retain the residence, but did not allow the retention of the rental property. *In re Lorenca*, 422 B.R. 665, 675 (Bankr. N.D. Ill. 2010).

The UST in *In re McKay* sought dismissal arguing the debtors' housing and vehicles were inordinately high, and if reduced, would allow for the payment of unsecured creditors through a Chapter 13 plan. The Court, examining the totality of the circumstances, declined to dismiss the case as an abuse of Chapter 7. The costs associated with the home were roughly four times the IRS Standards, but together with the car payments, were the only expenses that could be reasonably reduced. The debtors did not otherwise engage in an extravagant lifestyle and the bankruptcy was precipitated largely by the inability to sell a former residence abandoned when they moved to Georgia. The Court rejected what it characterized as the UST's request to "effectively evict the Debtors from their house, repossess their vehicles, and tell them where to live and what to drive." *In re McKay*, 463 B.R. 915, 924 (Bankr. S.D. Ga. 2010).

In the present situation, the UST also asks this Court to force the Debtors to surrender their Home, and in doing so effectively terminate Mr. Heath's business venture. In evaluating the totality of the circumstances unique to this case, and considering the relevant *Stewart* factors, this Court concludes allowing these Debtors to retain the Home is not an abuse of the Bankruptcy Code under the provisions of 11 U.S.C. §§ 707(b)(1) and (b)(3)(B). The Court firmly believes that our society is greatly benefitted if families stay together and the chance of that happening here increases exponentially by staying in the Home they have occupied for eight (8) years as a family. The Home houses both the family and the business. To reach any other conclusion forces the loss of the Home and another bankruptcy case in the future. Surely, Congress could not have intended that result here. It is therefore

ORDERED the Motion to Dismiss Debtors' Case pursuant to 11 U.S.C. § 707(b)(1) and 11 U.S.C. § 707(b)(3) is **DENIED**.

Dated this 26th day of May, 2016.

BY THE COURT:

_____
Joseph G. Rosania, Jr.
United States Bankruptcy Judge